Ikving H. Saypol, J.
In 1954 Kadel, a lawyer, Gladstone, Ms legally trained client and business friend or acquaintance, and Goddard were involved with others in the consummation of a business venture leading to the issuance of Standard Industries, Inc. stock. For his compensation in advancing the deal Gladstone would get 25,000 shares of the new stock, qualified against transference. Gladstone and Kadel had been in many business, professional and personal relationships and there had been money advances on both sides. At the same time Kadel held Gladstone’s promissory demand note, dated January 12, 1949, for $4,196.53 and another dated June 14,1950 for $5,000 ‘1 to the order of Mark Horblit & John Kadel ”.
Kadel, having loaned Gladstone $1,000 on March 23, 1954, advanced another $5,000 to him on July 2, 1954, and according to documents and according to the recording on his books- he reflected the latter payment together with the pre-existing $1,000 indebtedness as the consideration for the purchase of 15,000 shares of Gladstone’s Standard Industries, Inc. stock. Kadel died on December 5,1954.
Goddard brought an action in equity against Gladstone and others (Goddard v. Gladstone, 4 Misc 2d 227), seeking an accounting for 12,500 shares of the Standard stock. Gladstone impleaded Kadel’s executrix and cross-complained for the return of the 15,000 shares ostensibly purchased from him by her late husband, upon tendering repayment of the $6,000 which he denominated as a loan. The executrix simultaneously was suing Gladstone on various estate claims. By order on January 9, 1957 the Goddard case and three others by the executrix against Gladstone were consolidated. At the trial, without jury, Goddard’s case was discontinued as to all defendants except the executrix and Gladstone. Later, it was settled as to them too and various claims as between the Kadel Estate and Gladstone were settled and discontinued, leaving the following:
1. The cross claim asserted in the Goddard action by Gladstone against the Kadel Estate relating to the 15,000 shares of Standard Industries, Inc. stock (which will be referred to as the “ stock transaction ”).
2. The action on Gladstone’s note for $4,196.53 which had been secured by two oil paintings owned by Mrs. Gladstone, pleaded as the fifth cause of action in the Kadel action “ B ” which will be called the ‘ ‘ picture deal ’ ’.
*626 3. The action on Gladstone’s note of $5,000 to Mark Horblit and John Kadel pleaded by the Kadel Estate as the sixth cause of action in action ‘£ B ” which is called the ‘ ‘ Horblit note ’ ’.
While the documentary and record proof of the stock transaction, prima facie, supports the executrix’ contention that Gladstone sold his stock to her late husband for $6,000, the extraneous proof by competent paroi evidence (Smith v. Beattie, 31 N. Y. 542, 544), as an exception to the rule against oral modification of a written instrument, together with the evidence of Kadel’s conduct, demonstrates to the contrary that it was pledged for loans. There is some evidence that the stock at the time was worth considerably more than the $6,000, though incumbered by transfer restrictions.
Nothing was said or done at the time of this transaction by either of the principals about Gladstone’s then existing other indebtedness to Kadel, of which at least two such debts remain in suit here. Kadel simultaneously dictated a letter of defeasance although he never executed it. In succeeding months he took positive steps in Gladstone’s behalf to remove the transfer restrictions. Through Weisberg, Kadel’s law partner who had worked on the Standard transaction, and through Sanders, another lawyer, and from Begley, a wholly disinterested witness, it was shown that Kadel said, in November of 1954, that Gladstone owed him $6,000, to be repaid when Gladstone disposed of his stock.
The Standard stock transaction between Kadel and Gladstone is concluded to have been a pledge of collateral by Gladstone for Kadel’s loan to him of $6,000. Gladstone is entitled to receive the stock upon payment by him to the estate of $6,000.
In defending the action on the “ picture deal” of $4,196.53, Gladstone pleaded a special subsequent oral agreement for the sale and assignment to Kadel of the two pictures which were the collateral security for the loan. There was no proof at the trial of such an agreement. However, Gladstone now argues that by acts of dominion it is shown that the Kadels appropriated the collateral and extinguished the debt. Curiously enough, this is the converse of Gladstone’s argument about his Standard stock, viz., the stock was a collateral pledge although depicted as a sale; the paintings were bought although portrayed as a collateral pledge for a loan. There is nothing to his argument. I find no basis upon which to hold that the paintings were appropriated. Of controlling effect, on December 5, 1955, a year after Kadel’s death, in the related intermediate estate accounting in the Surrogate’s Court, Westchester County, in his answer to this claim (and he has, as observed, been trained *627 in the law), Gladstone fully described the transaction as a secured loan. I hold that this, as an admission, binds him and the executrix is entitled to judgment for the face amount of the note of $4,196.53.
Gladstone’s answer to the Horblit note pleaded a conditional delivery and lack of consideration. There was no such proof at the trial. On her prima facie case the executrix is entitled to judgment, except that Gladstone moved to dismiss for failure to make a prima facie case because the estate was not the real party in interest and on the ground that the estate did not have legal capacity to sue. The executrix argues preliminarily that neither of these grounds is tenable because they were not pleaded affirmatively in Gladstone’s answer. Where an assignment of a cause of action to the plaintiff is alleged as here and is denied by the defendant, the issue is properly presented and the defendant is not required to plead affirmatively (2 Carmody-Wait on New York Practice, § 26, p. 552, citing Spencer v. Standard Chem. & Metals Corp., 237 N. Y. 479; Wittner v. Burr Ave. Development Corp., 222 App. Div. 285, 286). Gladstone, in his answer, denies the allegation of the executrix of the assignment to her, as executrix, by Horblit, of his interest. That, I hold, is enough to present the question, and the objection of the executrix on this point is overruled.
On the main questions of lack of capacity to sue or lack of interest in the estate to maintain the action, Gladstone’s position is that a note to joint payees creates a joint tenancy with surviv-orship and therefore on Kadel’s death Horblit became the sole owner. He cites Sanford v. Sanford (45 N. Y. 723), involving a husband and wife, and Stelling v. Grabowsky (19 N. Y. S. 280), involving a note payable alternatively to two payees. From the argument for survivorship in Horblit and consequent lack of interest in the estate, Gladstone proceeds to the premise that a fiduciary cannot traffic in claims outside the estate, therefore she has no capacity to sue, citing Weeks v. O’Brien (25 App. Div. 206). The executrix argues that her late husband’s interest was that of a tenant in common, citing sections 65 and 66 of the Peal Property Law, Matter of Kimberly (150 N. Y. 90) and flatter of Blumenthal (236 N. Y. 448). On this premise, having an equitable interest, she contends on the basis of the assignment from Horblit her right to pursue on the instrument.
In Kadel’s lifetime either he or Horblit could receive payment and discharge the obligation. The indivisible nature of the note, it is true, is indicative of a tenancy in common, but the right to collect as distinguished from the right to sue is several. On Kadel’s death the right to collect passed to the surviving *628 payee, Horblit, and he alone could sue or collect without joining the executrix (People ex rel. Eagle v. Keyser, 28 N. Y. 226, 229, 230, concurring opinion, Selden, J., p. 232; Wilcox v. Murtha, 41 App. Div. 408, 410; see discussion in Hill v. Breeden, 53 Wyo. 125, cited in 10 C. J. S., Bills and Notes, § 553, subd. c; Weyrauch, Richardson on Contracts, § 300; Ehrlich v. Mulligan, 104 N. J. L. 375; 10 C. J. S., Bills and notes, § 194). The estate of the deceased joint payee, however, is entitled to participate in the judgment award to the extent of the rights under the contract made by the decedent (Wilcox v. Murtha, supra; Weyrauch, Richardson on Contracts, § 300). It cannot be disputed that if Horblit had predeceased Kadel the obligation would have passed to the executrix with not only right, but also duty to enforce it (33 C. J. S., Executors and Administrators, § 167). The executrix is not trafficking in strange claims foreign to her decedent (cf. Weeks v. O’Brien, 25 App Div. 206, 208, supra); rather the estate is interested in the chose in action. There can be no question of the validity and effect of Horblit’s assignment of the note. While it is not within the legitimate sphere of an executor in the ordinary case to purchase claims, it may happen as here that in the proper performance of her duties the executrix may and should acquire and enforce an obligation due the decedent (Matter of Jarvis, 158 Misc. 255, 258). Gladstone, while not denying this obligation which could be discharged upon payment to either payee, cannot dispute the right of the executrix so as to pay neither (Stelling v. Grabowsky, 19 N. Y. S. 280, 281, supra). Judgment on the Horblit note will be for the executrix.
Settle judgment in the consolidated action, awarding costs to Gladstone on his cross claim and costs to the executrix in the action on the notes, upon the foregoing prescribed decision.